**UNITED STATES, Appellee,**

v.

**Carl W. THARPE, Corporal U.S. Marine Corps, Appellant.**

**No. 67,861.**
**CMR No. 90 1082.**

U.S. Court of Military Appeals.

Argued Jan. 6, 1993.

Decided Sept. 27, 1993.

For Appellant: *Lieutenant Michael C. Pallesen, JAGC, USNR* (argued); *Lieutenant Mary L. Livingston, JAGC, USNR.*

For Appellee: *Lieutenant J.C. Foster, JAGC, USNR* (argued); *Colonel T.G. Hess, USMC* and *Commander W.F. Shields, JAGC, USN* (on brief); *Lieutenant K.S. Anderson, JAGC, USNR.*

## Opinion of the Court

COX, Judge:

Appellant pleaded guilty to a lengthy list of sordid specifications of rape, sodomy, and indecent assault of his stepdaughter.[1] His sexual attacks began upon her when she was 6 years old and continued until she was 10. They did not cease until appellant was assigned an overseas tour in Okinawa. The scope, frequency, and intensity of this conduct is detailed in appellant's guilty plea admissions and in a stipulation of fact agreed upon by appellant and the Government as part of a detailed pretrial agreement. It is also pertinent to note that, during the time appellant was privately committing these acts upon his stepdaughter, he was in the process of being charged, tried, convicted by a general court-martial—and treated—for indecently exposing himself on a number of occasions to the wives of fellow Marines. The bad-conduct discharge awarded as punishment in that case was suspended by the convening authority as a result of an elaborate pretrial agreement.

Because of the instant charges, appellant faced a sentence which included confinement for life, a dishonorable discharge, total forfeitures, and reduction to the lowest enlisted grade. In spite of these serious charges (each of the 11 rape specifications alone carried the potential for a life sentence) and appellant's prior sex-related conviction, counsel for appellant was able to negotiate a plea bargain that limited any confinement included in appellant's sentence to 12½ years.

Appellant now complains that his lawyer was ineffective in that he "failed to investigate and present evidence of appellant's childhood sexual abuse and expert testimony concerning the effect that abuse may have had on his sexual behavior as an adult."[2] Furthermore, he complains that

---

1. In all, appellant pleaded guilty to 11 specifications of rape, 8 of which were alleged as time intervals involving "numerous occasions"; 9 specifications of sodomy, 6 of which alleged "numerous occasions"; and 3 specifications of committing indecent acts upon the victim, each involving "numerous occasions," in violation of Articles 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934, respectively. Tried at Camp Pendleton, California, appellant was found guilty by a military judge sitting alone as a general court-martial. He was sentenced to a dishonorable discharge, confinement for 75 years, total forfeitures, and reduction to E-1. Pursuant to a pretrial agreement, the convening authority approved the sentence as adjudged but suspended confinement in excess of 12½ years and forfeitures in excess of

$1050.00 pay per month for 3 years or until execution of the discharge.

2. We granted review of the following issues:

I

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED BY FAILING TO FIND INEFFECTIVE ASSISTANCE OF COUNSEL WHERE THE TRIAL DEFENSE COUNSEL FAILED TO INVESTIGATE AND PRESENT EVIDENCE OF APPELLANT'S CHILDHOOD SEXUAL ABUSE AND EXPERT TESTIMONY CONCERNING THE EFFECT THAT ABUSE MAY HAVE HAD ON HIS SEXUAL BEHAVIOR AS AN ADULT.

II

WHETHER THE NAVY–MARINE CORPS COURT OF MILITARY REVIEW ERRED BY

the Court of Military Review erred by failing to order the Navy to provide a confidential expert to assist his appellate counsel in preparing his appeal from this negotiated guilty plea.[3] For the reasons set forth below, we hold that no error prejudicial to the substantial rights of appellant was committed. Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a).

The issues on appeal are somewhat complex. To understand them, it is necessary to digress to the underlying theory of appellant's petition to this Court. First of all, appellant claims that his trial defense lawyer was ineffective in the sentencing phase of the trial because he did not investigate and exploit the theory that appellant himself may have been abused as a child. Appellant argues that, had his defense counsel done so, some such evidence would have been available to present to the military judge and would have persuaded the judge to give appellant a sentence to confinement less than the 12½ years he ultimately received.

Secondly, appellant advances the novel argument that, in order for his appellate defense counsel to prepare his appeal, counsel should have available a *confidential* expert, specifically Lieutenant Commander Nacev, a clinical psychologist who is agreeable to provide this service, to peruse the numerous reports of psychiatric and psychological examinations performed on appellant as a result of the pending charges in this case and arising out of the counseling appellant received as a result of his first general court-martial. The expert would also, apparently, be given some "privileged information" not available in the record of trial or the allied papers.

This confidential expert could then advise appellate defense counsel concerning the evidence, her client, and the conduct of the case. Appellate defense counsel, in turn, would be better able to decipher and argue the evidence—and omissions—of record to the Court of Military Review, and so aid its judges in reviewing the case as required by Article 66, UCMJ, 10 USC § 866.

## *Adequacy of Representation*

In *United States v. Scott,* 24 MJ 186 (CMA 1987), we applied the rules announced by the United States Supreme Court for testing whether an accused received the effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We have consistently applied these rules and have not hesitated to grant an accused a rehearing under circumstances demonstrating a lack of effective performance by counsel. *United States v. Scott, supra; United States v. Lonetree,* 35 MJ 396 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993); *United States v. Polk,* 32 MJ 150 (1991). In *Polk,* construing *Strickland v. Washington, supra,* we articulated a three-part analysis to resolve claims of ineffective assistance of counsel:

1. Are the allegations made by appellant true; and, if they are, is there a reasonable explanation for counsel's actions in the defense of the case?

2. If they are true, did the level of advocacy "fall[ ] measurably below the performance ... [ordinarily expected] of fallible lawyers"?

---

REFUSING TO ISSUE AN ORDER OF CONFIDENTIALITY TO ALLOW APPELLATE DEFENSE COUNSEL TO FULLY INVESTIGATE AND PRESENT ISSUES RAISED BY THE CONFIDENTIAL PSYCHOLOGICAL REPORTS OBTAINED BY COUNSEL.

3. Appellant on October 10, 1990, filed a motion before the Court of Military Review seeking appointment of an expert and an order of confidentiality. The request was denied by order on February 22, 1991. Appellant then sought on March 14, 1991, reconsideration of the issue by the *en banc* Court of Military Review. His request was denied on April 9, 1991. Appellant then sought a Writ of Mandamus from this Court directing the "Court of Military Review to issue an Order of Confidentiality to Lieutenant Commander Vladimir Nacev, Ph.D., Medical Service Corps, U.S. Navy, to protect from discovery by the Government his appellate defense counsel's disclosure of privileged information to this expert consultant." We denied the petition for extraordinary relief on May 16, 1991, without prejudice to raise the issue on appeal. 33 MJ 166.

3. If ineffective assistance of counsel is found to exist, "is ... there ... a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt?"

*Id.* at 153 (citations omitted).

Likewise, we have applied this test to the question whether an accused should be afforded a new sentencing hearing where counsel's lack of effective assistance may have resulted in a harsher sentence. *United States v. Lonetree, supra.*

■ Applying this analysis to the facts presented here, we conclude appellant does not get beyond the first test. It is true that trial defense counsel did not pursue appellant's claim of having been abused extensively as a child—but then trial defense counsel was not even aware of this dubious claim, made by appellant primarily to a brig counselor in Okinawa. Not being aware of this "information" and given appellant's established pattern of misconduct, counsel's tactic "was to focus away from all his past attempts at therapy and to stress his few good military traits, his remorse, and his willingness to seek help." From our review of the record, this was an appropriate tactic under the circumstances, one that a reasonable, competent, and effective lawyer would employ in the defense of a client. Thus, the first prong of the analysis is not met.

In any event, failure to pursue this line of potential mitigation is inconsequential under the circumstances. According to trial defense counsel's uncontroverted post-trial affidavit, "Corporal Tharpe was evaluated by psychiatrists and psychologists on six (6) different occasions between September, 1986 and September, 1989, [and] never in any of those sessions did he make any of the same drastic claims that he made" later in Okinawa. The six reports relied upon by the defense counsel indicate a normal childhood and an initial "sexual experience ... at the age" of 17. The reports contain absolutely no assertion by appellant that he had been abused as a child, and in some cases the reports indicate appellant's specific denial of having been abused as a child.

Further, as trial defense counsel persuasively argues in his affidavit, even if he had known of the counseling statement from Okinawa, he would not have dared used it. It so contradicted everything else that appellant had told the experts that the prosecution rebuttal would have easily shattered any possible remnant of appellant's good faith and credibility.

The dissenting opinion charges (38 MJ at 27) that trial defense counsel was not aware of the abuse "evidence" in his own case file. It must be clearly noted, however, that there is not a scrap of support for this astonishing, unilateral contention. Appellate defense counsel clearly states, on brief, that she found only *three* items in trial defense counsel's case file, items which supposedly should have impelled trial defense counsel to further investigate the possible sexual abuse of appellant as a child. Final Brief at 8.

These items include a one-sentence excerpt from the report by Dr. Stubbs, a defense psychologist, which states:

> *While ... [appellant] denied conscious knowledge of any molest of his own* there is strong support both in the interview and the testing data *to forward the hypothesis* that he was the victim of some significant physical, emotional, and sexual abuse.

(Emphasis added.) This "hypothesis" can only be characterized as speculative.

The dissenting opinion, however, transforms this "hypothesis" fragment into a:

> glaring report from Dr. Stubbs ... that contained suggestions that appellant *had been the victim* of child sexual abuse....

38 MJ at 27 (emphasis added).

Another one-sentence excerpt from the case file relied on by the dissent was the following hearsay statement of appellant's wife, contained in a San Diego social worker's report:

Mrs. Th[a]rpe states that to her knowledge Mr. Th[a]rpe has a family history of sexual abuse.

The basis of this claimed knowledge is, of course, not mentioned. The unlikelihood that Mrs. Tharpe was around to have personal knowledge of such conduct is self-evident. This hearsay sentence is best characterized as dubious.

The final item appellate defense counsel reports having found in the case file was a "Self–Description Checklist" *See* Appendix A. According to appellate defense counsel, this was part of appellant's Aug. 5, 1988, evaluation for depression at Naval Hospital Camp Pendleton, which was the fourth of seven psychiatric/psychological evaluations recited by trial defense counsel in his affidavit. *See* Appendix B. Though multiple past disturbances and misbehaviors have been checked off on this unsigned list (*e.g.*, sexually abused, cruelty to animals, suicidal thoughts, physically abused, depression, sexually very active, sexual problems, raped someone), trial defense counsel notes that the evaluation report itself recites that appellant

stated that he was raised primarily by his grandmother, but reported good relations with both parents. Cpl Tharpe reported an essentially normal childhood.

According to trial defense counsel, this report was contained in appellant's medical records; and the accuracy of trial defense counsel's description of it is unchallenged by appellant.

This checklist also can only be described as dubious. First, it apparently conflicts with appellant's statements during that very evaluation. Second, it appears appellant had been caught fudging in similar circumstances in the past. Trial defense counsel notes in his affidavit that the sanity board conducted in conjunction with appellant's prior court-martial found that appellant

in filling out all the test documents had attempted to "fake bad" in a conscious effort to be seen as crazy and so mitigate his culpability.

The existence of this sanity board finding, as reported by trial defense counsel, also stands unrebutted here.

Most obviously, as trial defense counsel would have been painfully aware, appellant's credibility and integrity were negligible, due to the fact that he had conned the therapists into pronouncing him rehabilitated, after their extensive counseling and therapy efforts following his prior general court-martial for indecent exposure. Unbeknownst to the well-meaning therapists, however, appellant's sexual exploitation of his stepdaughter escalated throughout the entire period of his "successful" therapy.

The three foregoing bits—the single sentences from the Stubbs' report and Mrs. Tharpe's hearsay statement, as well as the checklist—were the *only* arguable indicia of abuse appellate defense counsel reports finding in trial defense counsel's file. Final Brief at 8. Also contrary to the assertion of the dissent, there is absolutely no suggestion that trial defense counsel was not "aware" of what was in his case file or that he had not read it. Obviously the foregoing pitiful fragments amounted to nothing as compared to the vast quantum of refutatory ammunition readily available to the Government.

The "Okinawa report" (*see* Appendix C), on the other hand, was prepared June 15, 1989, in Okinawa, upon appellant's apprehension for sexually abusing his stepdaughter in California. The report is addressed to "Secretary of the Naval Clemency Board, Washington, D.C., Via: Commandant of the Marine Corps."

As implicitly acknowledged by appellate defense counsel, Final Brief at 2–3, this report contains by far the most extensive assertions of abuse made by appellant. In part, the report relates:

Tharpe describes his childhood as, "I can tell you things you wouldn't believe. I could write a book." Tharpe stated he observed numerous acts of incest and sexual relationships between humans and horses. He stated everybody in his "community" were all related, describing members of his family as being inter-

bred. Tharpe stated his father molested and had an ongoing sexual relationship with his sister. Tharpe did not say he actually saw any sexual contact between his father and his sister, but that his sister had confined [sic] in him, that his father had "inserted himself" into her. When asked if he had been sexually molested, Tharpe stated, "I don't think so, I don't remember." When asked if any sexual misconduct had been reported, Tharpe stated, "where I come from, you don't report these things, it's just a way of life." The only time Tharpe described any type of abuse involving himself, was when a school teacher had placed her hand down his pants to see if he had wet his pants. Tharpe indicated he was old enough to be "affected." Tharpe also indicated he had a history of bed wetting. Tharpe stated he had witnessed sexual contact between horses and horses and humans. Tharpe stated the "older" children forced the younger children to watch and also perform sex. Tharpe stated he felt he was physically abused by the older children, as he was forced to fight other children, made to hide behind a tree while being shot at with a BB gun, forced to have sex with other children his own age.

Particularly with respect to appellant's own sexual activity and his relationship with his parents, these assertions stand in stark contrast with appellant's statements to the psychiatrists/psychologists.

This "Okinawa" report is also what the California-based trial defense counsel clearly denied knowing about:

At that time [6 July 1989], I specifically asked him to tell me about everyone he had spoken to on Okinawa because I was aware that he had made admissions to both agents of the Naval Investigative Service on 14 June 1989 and his wife in letters and telephonically. *At no time did Corporal Tharpe ever advise me that he had spoken to a counselor at the brig in Okinawa.* The first time I was made aware of the Prisoner's Summary Continuation Sheet ... was on 23

July 1991 when Government Appellate Counsel advised me of its existence.

(Emphasis added.) Trial defense counsel's position in his affidavit was that, even if he knew about the Okinawa report, he would not have used it due to appellant's credibility problem and the mass of contradictory evidence having issued from his own mouth.

Appellant's trial was conducted on September 21, 1989, at Camp Pendleton. The allied papers contain a document entitled, "Prisoner Assignment and Clemency Board Action," dated Jan. 16, 1990. Immediately following this document is a handwritten "Request for Restoration/Clemency," also dated Jan. 16, 1990, submitted by appellant. Following these are three "Prisoner's Progress Summary Data" documents, the oldest of which is the "Okinawa" report. All of the progress summaries are addressed: "Secretary of the Naval Clemency Board, Washington, D.C., Via: Commandant of the Marine Corps." The appearance of these document in the allied papers does not indicate that trial defense counsel, 4 months earlier at the court-martial, was aware of the Okinawa report at the time of trial or that it was then in his case file. Appellate defense counsel do not claim to have found this document in trial defense counsel's case file. Trial defense counsel denies knowledge of the document until long after trial, when his competence was first being attacked.

■ Under all these circumstances, including the favorable pretrial agreement skillfully negotiated by counsel, we cannot imagine a reasonable probability that appellant would have benefited from an attempt to exploit this belated and suspect claim of appellant. Thus, even if we were to reject counsel's explanation for failing to investigate this theme, we are confident that appellant was not prejudiced.

*Appellate Expert Assistance*

■ As previously noted, appellant seeks to bootstrap his claim of ineffective assistance of trial defense counsel with a request that the Court of Military Review

order appointment of a confidential expert to his appellate team to assist appellate defense counsel in the preparation of the appeal.[4] *See* Mil.R.Evid. 502, Manual for Courts–Martial, United States, 1984; *cf. United States v. Toledo*, 25 MJ 270 (CMA 1987), *original opinion adhered to on recon.*, 26 MJ 104 (CMA), *cert. denied*, 488 U.S. 889, 109 S.Ct. 220, 102 L.Ed.2d 211 (1988). The Court of Military Review declined.

As we have acknowledged, "It is well established that, upon a proper showing of necessity, an accused is entitled to the assistance of an expert to aid in the preparation of his defense." *United States v. Burnette*, 29 MJ 473, 475(CMA), *cert. denied*, 498 U.S. 821, 111 S.Ct. 70, 112 L.Ed.2d 43 (1990); *see Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985); *United States v. Van Horn*, 26 MJ 434 (CMA 1988). We have not limited expert assistance to the trial of a case. Experts have also been made available to assist counsel in preparing an appropriate appeal. *United States v. Curtis*, 31 MJ 395 (Daily Journal CMA 1990).

Regarding appellant's showing of necessity, he cites three areas in which he hopes the expert would be of assistance in establishing the inadequacy of his trial representation. First, appellant hopes to bolster his contention that trial defense counsel's representation was inadequate in failing to present evidence, in mitigation of sentence, which suggested that appellant was a victim of child sexual abuse. In that regard, appellant asserts, the expert could review in confidence the as-yet-privileged portions of the psychiatric and psychological tests and reports currently in defense hands. Thus armed, the expert could suggest

> what evidence of appellant's history of abuse which was available to trial defense counsel should have been presented, what impact appellant's own abuse played on the offenses for which appellant was charged and convicted, what questions should have been asked of the government expert, and what possible impact this evidence might have had on the trier of fact.

Final Brief at 12. In addition, appellant wants the expert to be able to interview him in confidence.

Second, appellant asserts that trial defense counsel may have been inadequate in failing to investigate and present an issue regarding appellant's mental responsibility. Appellant argues that a question of mental responsibility, hence presumably trial defense counsel's inadequacy in failing to press same, arose from the testimony of a

---

4. Certainly it appears from paragraph 6 of the affidavit of Lieutenant Commander Nacev, which was attached to the motion for appointment of an expert, that he was "ready, willing and able to provide the required assistance." Furthermore, his "present duties do not preclude my participation on behalf of Corporal Tharpe." He was "available to assist in his appellate case." We have made it clear, however, that neither an accused nor his or her counsel may simply "commandeer" a military person to be his private expert. The expert must be made available through the medium of a request via the appropriate military chain of command. *United States v. Toledo*, 25 MJ 270, 276 (CMA 1987), *opinion adhered to on recon.*, 26 MJ 104 (CMA), *cert. denied*, 488 U.S. 889, 109 S.Ct. 220, 102 L.Ed.2d 211 (1988). "Otherwise, an accused could arbitrarily commandeer a valuable government employee without appropriate considerations of availability, priority of missions, or otherwise." 26 MJ at 105. *See* RCM 703(d), Manual for Courts–Martial, United States, 1984.

For the very same reasons that a military accused or defense counsel cannot commandeer a government employee without an appropriate decision being made through the appropriate chains of command, a military judge or an appellate court ordinarily should not reach out and designate a particular person as an expert witness in a case. *But cf. United States v. True*, 28 MJ 1 (CMA 1989). It is clear, however, that military judges have the power to ensure that experts will, in appropriate cases, be provided. But only in an extraordinary case would the military judge (or appellate court) order that a particular expert be appointed. *United States v. Garries*, 22 MJ 288(CMA), *cert. denied*, 479 U.S. 985, 107 S.Ct. 575, 93 L.Ed.2d 578 (1986); *United States v. True*, 28 MJ 1057 (NMCMR 1989). Judicial abatement of the proceedings until command authorities make an adequate expert available is usually an equally effective remedy. *United States v. True*, 28 MJ at 4.

government expert on sentencing that child sexual abusers' behavior is "something they don't have control over." The expert described it as an "addiction." Final Brief at 12. [Though we disagree that this particular testimony implicated the defense of mental responsibility, *see* RCM 916(k)(1), Manual, *supra,* we will construe the gist of appellant's contention to be that trial defense counsel's performance was subpar in failing generally to investigate or raise mental responsibility as a defense.]

■ Appellate counsel's third contention turns out to be a mere reassertion of the first contention—that trial defense counsel's failure "to fully develop the issue of the impact of appellant's own victimization on the present offense" had an adverse impact on "sentence appropriateness." Final Brief at 13. Based on these attempted justifications, we must agree with the Court of Military Review that the need for a confidential expert is not established.

The issue before us is not whether there is, or may be developed, some new opinion evidence that appellant was actually abused as a child or lacked mental responsibility. The question is whether trial defense counsel made a valid tactical decision, given the information and options available. Trial defense counsel's decision is not rebutted by dredging up some new evidence supporting appellant's belated contention. This is not a new trial on the merits smuggled into the appellate process. New trials are governed by RCM 1210. *See United States v. Parker,* 36 MJ 269 (CMA 1993). Inquiries into appellant's

mental condition are governed by RCM 706.

The circumstances of this case are very different from those in *Toledo,* where defense counsel, prior to trial, got a military psychologist to agree to make a confidential assessment of the accused's mental status before the defense decided whether to request a formal inquiry into the accused's mental status. *See* RCM 706. Based on the results of that spot check, the defense elected to forgo the RCM 706 inquiry, and they did not present a mental responsibility defense.

Later, at trial, Toledo propounded a rather elaborate testimonial explanation of the events on the evening in question, testimony which he hoped would persuade the factfinder to acquit him. In rebuttal, the Government called to the stand the psychologist who had previously examined the accused. Upon court order, the witness related, *inter alia,* certain statements made by appellant to the psychologist that seemed to contradict appellant's trial account of the events on the evening in question. Toledo did not, at trial, argue that the psychologist's services fell within the attorney-client privilege, and we did not deem them such under the circumstances. 25 MJ at 276. Had the accused asserted a need for expert assistance to prepare for the court-martial, however, we indicated we would have agreed.[5]

Here, in contrast, the formal evidentiary phase of the court-martial has passed. Appellate defense counsels' mission is to show that trial defense counsel's election of strategy was deficient. Yet trial defense

**5.** As in federal law, there is no physician-patient or psychotherapist-patient privilege in the military. However, Mil.R.Evid. 502, Manual, *supra,* provides:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications *made for the purpose of facilitating the rendition of professional legal services to the client,* (1) between the client or the *client's representative* and the lawyer or the *lawyer's representative,* (2) between the lawyer and the *lawyer's representative,* (3) by the client or the client's lawyer to a lawyer representing another in a matter of

common interest, (4) between *representatives of the client* or between the client and a *representative of the client,* or (5) between lawyers representing the client.
(Emphasis added.)
"A 'representative' of a lawyer is [defined as] a person employed by or assigned to assist a lawyer in providing professional legal services." Mil.R.Evid. 502(b)(3). No definition of "representative of the client" is provided. However, given an adequate showing of need, we have indicated that a psychotherapist would seem to fit within this rule. *United States v. Toledo,* 25 MJ at 276 and 26 MJ at 105.

counsel's assertion that appellant's own statements precluded this belated mitigation theory stands unrebutted. The professional opinions of an expert directly (or, indirectly, through the argument of counsel) on the quality of trial representation or on other approaches that might have been taken are not presently germane. Thus, the Court of Military Review can hardly have erred in failing to appoint Dr. Nacev as a confidential advisor to pursue those matters. Moreover, it is clear what trial defense counsel did or did not do. The Court of Military Review did not need expert opinion to tell them that.

█ Notwithstanding the Court of Military Review's refusal to appoint a confidential advisor, appellate defense counsel has launched an impressive attack on trial defense counsel. It is unclear whether appellate counsel availed themselves of the non-confidential advice of Lieutenant Commander Nacev in formulating their appellate argument. It is clear, however, as noted earlier, that the tactics employed by the trial lawyer were well within those recognized as acceptable in the legal community. The fact that appellate defense counsel have now conceived a different trial tactic from the one used at trial does not mean that the lawyer at trial was ineffective. *United States v. DiCupe*, 21 MJ 440 (CMA), *cert. denied*, 479 U.S. 826, 107 S.Ct. 101, 93 L.Ed.2d 52 (1986).

We are satisfied that the Court of Military Review had ample information to decide whether the findings and sentence in this case were correct in fact and law. Art. 66. We have carefully reviewed the entire record of trial and the allied papers, including the affidavit of appellant's trial defense counsel, and we conclude that appellant was not denied effective assistance of counsel at trial. In addition, even though the appropriateness of an order of "confidentiality" has not been shown, we are satisfied that the lack of such protection did not hinder the legitimate preparation of this appeal.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD and GIERKE concur.

## APPENDIX A

### IX. SELF-DESCRIPTION CHECKLIST: CHECK ALL ITEMS THAT DESCRIBE YOU in the PAST (childhood and adolescence) and PRESENT (adulthood & recently):

| PAST | PRESENT | | PAST | PRESENT | |
|------|---------|---|------|---------|---|
| [✓] | [ ] | BED WETTING | [ ] | [ ] | WEIGHT PROBLEMS: lose? gain? |
| [ ] | [ ] | FIRE SETTING | [ ] | [ ] | BINGE EATING |
| [✓] | [ ] | CRUELTY TO ANIMALS | [ ] | [ ] | PURGING by vomiting or laxatives |
| [✓] | [ ] | SLEEP WALKING | [✓] | [✓] | CANT TRUST PEOPLE |
| [✓] | [ ] | NAIL BITING | [ ] | [✓] | CONFLICT WITH AUTHORITY |
| [✓] | [ ] | STEAL THINGS | [ ] | [ ] | OTHERS CAUSE ME PROBLEMS |
| [✓] | [ ] | SUICIDAL THOUGHTS | [ ] | [✓] | DIFFICULTY MAKING DECISIONS |
| [✓] | [ ] | PHYSICALLY ABUSED | [ ] | [✓] | IRRITABLE: EASILY ANGERED |
| [ ] | [✓] | ANGRY OUTBURSTS | [ ] | [✓] | DIFFICULTY EXPRESSING FEELINGS |
| [ ] | [✓] | INJURED SOMEONE | [ ] | [ ] | DIFFICULTY FOLLOWING ORDERS |
| [✓] | [ ] | SEXUALLY ABUSED | [ ] | [ ] | SENSITIVE |
| [ ] | [ ] | SUICIDE ATTEMPT | [ ] | [ ] | RELIGIOUS |
| [✓] | [ ] | FINANCIAL PROBLEMS | [✓] | [✓] | CRY FREQUENTLY |
| [✓] | [✓] | WORK TOO HARD | [ ] | [ ] | OTHERS DON'T TRUST ME |
| [✓] | [✓] | LOSS OF INTEREST | [✓] | [✓] | AFRAID OF LOSING CONTROL |
| [ ] | [ ] | LONER | [✓] | [✓] | DAYDREAM FREQUENTLY |
| [ ] | [ ] | GAMBLER | [✓] | [✓] | SEXUALLY VERY ACTIVE |
| [ ] | [ ] | MOOD SWINGS | [✓] | [✓] | SEXUAL PROBLEMS |
| [ ] | [✓] | FIGHTING | [ ] | [ ] | MY DREAMS COME TRUE |
| [ ] | [ ] | COLLECT WEAPONS | [ ] | [ ] | DRUG USE |
| [ ] | [ ] | VANDALIZE PROPERTY | [✓] | [✓] | HEADACHES |
| [ ] | [ ] | ALCOHOL PROBLEMS | [ ] | [ ] | BACK PAINS |
| [ ] | [ ] | VEHICLE ACCIDENTS | [ ] | [ ] | NERVOUS STOMACH |
| [ ] | [ ] | DUI | [ ] | [ ] | FATIGUE or CONSTANT TIREDNESS |
| [✓] | [✓] | SLEEP DIFFICULTIES | [ ] | [ ] | CHEST PAINS |
| [✓] | [✓] | DEPRESSION | [ ] | [ ] | NECK PAIN |
| [ ] | [✓] | ANXIETY: WORRY | [ ] | [ ] | SHORTNESS of BREATH or ASTHMA |
| [ ] | [ ] | PUT THINGS OFF | [ ] | [ ] | NAUSEA and/or VOMITING |
| [ ] | [ ] | TAKE RISKS | [ ] | [ ] | LOSS OF APPETITE |
| [ ] | [ ] | AFRAID OF PEOPLE | [✓] | [✓] | DIFFICULTY CONCENTRATING |
| [ ] | [ ] | LESS SEXUAL INTEREST | [ ] | [ ] | HOMOSEXUAL ACTS |
| [✓] | [✓] | DEATH IN THE FAMILY | [ ] | [ ] | THOUGHTS NOT YOUR OWN |
| [ ] | [ ] | BEEN RAPED | [ ] | [ ] | SEE THINGS OTHERS DON'T |
| [ ] | [ ] | DEATH OF A FRIEND | [ ] | [ ] | HEAR VOICES OTHERS DON'T |
| [ ] | [✓] | LYING | [ ] | [ ] | FEEL PICKED ON or PERSECUTED |
| [ ] | [ ] | MISCARRIAGE | [ ] | [ ] | PREMENSTRUAL SYNDROME |
| [ ] | [ ] | ABORTION | [✓] | [✓] | RAPED SOMEONE |

## APPENDIX B

### IN THE UNITED STATES
### NAVY-MARINE CORPS COURT OF MILITARY REVIEW

| | | |
|---|---|---|
| U N I T E D   S T A T E S,<br>Appellee<br>v.<br>Carl W. THARPE<br>413 11 8668<br>Corporal (E-4)<br>U. S. Marine Corps,<br>Appellant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | AFFADAVIT<br>OF<br>MICHAEL J. KEEGAN<br>CAPTAIN, U. S  MARINE CORPS |

---

I, Captain Michael J. Keegan, U. S. Marine Corps, state that the following facts are true to the best of my knowledge and belief:

I first met Corporal Tharpe on 6 July 1989, when I interviewed him at the brig aboard Camp Pendleton, California. At that time, I specifically asked him to tell me about everyone he had spoken to on Okinawa because I was aware that he had made admissions to both agents of the Naval Investigative Service on 14 June 1989 and his wife in letters and telephonically. At no time did Corporal Tharpe ever advise me that he had spoken to a counselor at the brig in Okinawa. The first time I was made aware of the Prisoner's Summary Continuation Sheet contained in Appellant's Assignment of Error was on 23 July 1991 when Government Appellate Counsel advised me of its existence.

Even if I had known of this information, I would not have used it at trial because it would have been quickly and easily discredited by the government and used as aggravation against Corporal Tharpe. Corporal Tharpe was evaluated by psychiatrists and psychologists on six (6) different occasions between September, 1986 and September, 1989, never in any of those sessions did he make any of the same drastic claims that he made in the Prisoner's Summary Continuation Sheet. To briefly summarize his statements regarding his youth and sexual experience in those sessions:

1) 6 September 1986, counseled by Dr. Faye Girsch, clinical and forensic psychologist, civilian, at the behest of the defense prior to Cpl. Tharpe's first court-martial. During this session, Cpl Tharpe stated that he was essentially raised by his grandmother and was "spoiled" as a child. He further stated that his first sexual experience was at age 17, with a girlfriend. These documents were used by the defense to obtain clemency and so were available to the government.

2) 8 September 1986, self-referral to USNH Camp Pendleton for depression over pending court-martial. Cpl Tharpe stated that his parents had been divorced since his birth. Cpl Tharpe also stated he was upset because someone had "accused him of molesting his daughter 2 months ago but that an exam failed to substantiate that allegation." (Cpl Tharpe pleaded guilty to molesting Honeye Walcott beginning in June 1985) This report was in Cpl Tharpe's medical record.

3) 24 September 1986, R.C.M. 706 examination conducted in conjunction with the court-martial. Cpl Tharpe stated that his parents were never married and that he was raised by his grandmother. Although not in the report, in the doctor's notes it says Cpl Tharpe stated that when he was ten he knew of or saw an incident in which some cousins raped an aunt and her daughters. Cpl Tharpe went on to state that his first experience with sex was when he was between the ages of 17 and 18, with a girlfriend. The doctor's notes also indicate that Cpl Tharpe in filling out all the test documents had attempted to 'fake bad' in a concious effort to be seen as crazy and so mitigate his culpability. This report was used in Cpl Tharpe's first trial.

4) 5 August 1988, self-referral to USNH Camp Pendleton for depression. Cpl Tharpe stated that he was raised primarily by his grandmother, but reported good relations with both parents. Cpl Tharpe reported an essentially normal childhood. This report was in Cpl Tharpe's medical record.

5) During all of 1987 and part of 1988, Cpl Tharpe was attending counseling sessions with the Family Advocacy program at Camp Pendleton, in compliance with his agreement from his first court-martial. During this time, he was continuing to molest his step-daughter and never acknowledged it or sought help from his counselors. The counselors were available to testify. Cpl Tharpe also never related to them anything remarkable about his past.

6) 18 and 20 July 1989, R.C.M. 706 examination. Cpl Tharpe stated he was raised by his grandmother, was a good student in school, afraid of his father, had minimal contacts with his mother, denied any sexual relationships during his developmental years, stated that his first sexual relationship was with a girlfriend at age 17. This report would have been available for use by the government pursuant to MRE 302 had I attempted to use the report from Okinawa.

7) 18 September 1989. Cpl Tharpe is examined by Dr. Bruce Stubbs. Cpl Tharpe denied he had ever been abused as a child, stated that he had engaged in mutual fondling with girls his own age during his youth, and that his first real sexual experience was with a girlfriend at age 17. If Dr. Stubbs had been called to testify, he would have stated under cross-examination that Cpl Tharpe was not amenable to therapy and that confinement was necessary to prevent him from continuing to molest children.

The records of all these counselling sessions, copies of which were provided to Appellate Defense Counsel in September 1990, clearly indicate that Cpl Tharpe's credibility and veracity is suspect. More importantly, assuming, arguendo, that I had known about the statements to the counselor on Okinawa, I would not have used them as some type of mitigation. That would have opened the door for the prosecution to use all of his other statements which, taken all together, would have negated any rehabilitation potential we might have otherwise been able to show. In my judgement, the best course of action at that time was

to focus away from all his past attempts at therapy and to stress his few good military traits, his remorse and his willingness to seek help.

WITNESS the following signature this 31st day of July, 1991.

Michael J. Keegan

With the United States Armed Forces
At Quantico, Virginia

I, Major Ronald L. Rodgers, the undersigned officer, do hereby certify that on this 31st day of July, 1991, before me, personally appeared Captain Michael J. Keegan, USMC, 016508525, whose home address is Quarters #4425B, MCCDC, Quantico, Virginia 22134, and who is known to me to be a Captain in the U. S. Marine Corps, and to be the identical person who is described in, whose name is suscribed to, and who signed and executed the foregoing affadavit. I do further certify that I am at the date of this certificate a commissioned officer of the grade, branch of service, and organization stated below in the active service of the United States Armed Forces, that by statute no seal is required on this certificate, and that the same is executed in my capacity as a judge advocate under authority granted to me by Article 136, UCMJ.

Ronald L. Rodgers
174 48 2198, Major, USMC
OSJA, MCCDC, Quantico, VA.

## APPENDIX C

| PRISONER'S SUMMARY CONTINUATION SHEET | | DATE PREPARED | PAGE NO. | NO. OF PAGES |
|---|---|---|---|---|
| [X] ADMISSION SUMMARY    ☐ PROGRESS SUMMARY | | 890615 | 2 | 5 |
| ORGANIZATION<br>JFB, Camp Hansen, FPO Seattle, Washington 98773-5013 | | DEPARTMENT OF MILITARY SERVICE<br>USMC | | |
| LAST NAME - FIRST NAME - MIDDLE INITIAL<br>Tharpe, Carl W. | | SSN<br>413 11 8668 | | |

b. **Prisoner's Version (con't):** stated he was fully aware of his rights, citing he needed to talk, but did not want to talk about anything that would compound his current charges. Tharpe admitted to having a 3 year, ongoing, sexual relationship with his stepdaughter. Tharpe indicated she knew him better than his wife or anyone else. Tharpe stated she is a "fox" and more mature, in many ways, than her age. Tharpe stated he never physically hurt his stepdaughter. He denied having any sexual relationship with his stepson.

2. **PRIOR OFFENSE**

a. **Civil:** None stated. (NV)

b. **Military:** In November 1979, Tharpe received his 1st Article 15 for violation of Article 113, sleeping on post. He was awarded forfieture of $75.00 for 2 months. In October 1980, he received his 2nd Article 15 for violation of Article 86, unauthorized absence, in which he was late for duty. He was awarded a forfeiture of $150.00 for 1 month. In November 1986, Tharpe received a General Court-Martial conviction for violation of Article 134 (5 specifications), indecent exposure. he was sentenced to confinement at hard labor for 6 months, reduced to E-1, forfeiture of $400.00 x 6 months, and a BCD. Convening Authority's Action, dated 870220, the sentence is approved and, except for the part of the sentence extending to a bad-conduct discharge, will be executed, but the execution of that part of the sentence extending to a bad-conduct discharge and confinement in excess of 120 days is suspended for a period of 16 months; forfeitures in excess of $100 per month for 6 moths and reduction in grade below E-3 and automatic reduction to E-1, is suspended for 12 months.

3. **PERSONAL HISTORY**

a. **General Background:** Tharpe is a married, 29 year old, black, male, Marin... He is the youngest of 2 children, both of whom were born out of wedlock. Tharpe's parents were never married to one another, however his father was married and had several children. Tharpe stated he was never allowed to associate with his father's wife or children, while he was growing up. Tharpe's father is approximately 62 years old and is a mortician. He is in good health and currently resides in Camden, Tennesse. When talking about his relationship with his father, Tharpe stated, "now, can't really say, he's my father." Tharpe's mother is approximately 52 years old and works "wherever work is available." His mother is in good health and has never married. Tharpe describes his relationship with his mother as, "that's my mom, great." She currently resides in Camden, Tennesse. His sister is a 32 year old divorcee, which has 4 children. Tharpe describes their relationship as, "I love my sister, she loves me." Tharpe states his sister does not have "all her screws" which he believes she is mentally disturbed. Tharpe discribes his childhood as, "I can tell you things you wouldn't believe. I could write a book." Tharpe stated he observed numerous acts of incest and sexual relationships between humans and horses. He stated everybody in his "community" were all related, describing members of his family as being, interbred. Tharpe stated his father molested and had an ongoing sexual relationship with his sister. Tharpe did not say he actually saw any sexual contact between his father and his sister, but that his sister had confined in him, that his father had "inserted himself" into her. When asked if he had been sexually molested, Tharpe stated, "I don't think so, I don't remember." When asked if any sexual misconduct had been reported, Tharpe stated, "where I come from, you don't report these things, it's

22

**☒ ADMISSION SUMMARY  ☐ PROGRESS SUMMARY**

| ORGANIZATION | DEPARTMENT OF MILITARY SERVICE |
| JFB, Camp Hansen, FPO Seatle, Washington 98773-5013 | USMC |
| LAST NAME - FIRST NAME - MIDDLE INITIAL | SSN |
| Tharpe, Carl W. | 413 11 8668 |

a. **General Background (con't):** just a way of life." The only time Tharpe described any type of abuse involving himself, was when a school teacher had placed her hand down his pants to see if he had wet his pants. Tharpe indicated he was old enough to be "affected." Tharpe also indicated he had a history of bed wetting. Tharpe stated he had witnessed sexual contact between horses and horses and humans. Tharpe stated the "older" children forced the younger children to watch and also perform sex. Tharpe stated he felt he was physically abused by the older children, as he was forced to fight other children, made to hide behind a tree while being shot at with a BB gun, forced to have sex with other children his own age. Tharpe describes himself to be "raging" inside of himself. Tharpe indicated he came from a low income area, from the country, where things that he has been describing is just a way of life. Tharpe was married in May 1985, in Leavenworth, Kansas. His wife is a 35 year old divorcee. She has 2 children by a previous marriage. Tharpe stated he knew his wife 2 1/2 years prior to their marriage. Tharpe stated he met his wife, while she was still married. Her husband was in the Army and was overseas when they met, but she indicated that their marriage was just about over. His wife is a Civil Servant, working for the government as a Purification Operator. Tharpe did not want to talk about his wife's past history. Tharpe's stepson is 12 years old, which he describes his relationship with him as, "the same as my father's and mine." Tharpe stated he does not talk to his stepson much and devotes most of his time to his stepdaughter, just like his father ignored him and spent his time with his sister. Tharpe indicated he never had any sexual relations with his stepson, nor did he ever physically hurt him. Tharpe's stepdaughter is 10 years old. Tharpe calls his step-daughter, "Honey." Tharpe describes his relationship with his stepdaughter as, "great." Tharpe admits to having a 3 year, ongoing sexual relationship with his stepdaughter. He states she does "special things" for him and that she knows him better than his wife. Tharpe's wife and their children live in Vista, California. Tharpe states he does not have a drinking problem, describing himself as a periodic, social drinker. When talking about his drinking, Tharpe is vague and unclear, which his contradicts himself. When asked if he ever tried any drugs, Tharpe stated, "I will have to see what is in my SRB. I don't want to answer."

b. **Educational Development:** Tharpe indicated he quit school after completing the 11th grade, because he quit basketball and his grades started to decline. He also stated he was getting bored with school and he did not really care any more. Tharpe obtained his GED during his 1st enlistment. Tharpe described himself as a "good student," but ran with the wrong crowd. He was never suspended or expelled. Tharpe stated he did not get along with his teachers too well, specifically citing 2 football coaches, stating they scared him. Tharpe stated he got along well with his fellow students. He played basketball when he was attending high school. He was not offered any scholarships, nor did he attend any college.

c. **Occupational Development:** Prior to his entry into the Marine Corps, Tharpe worked numerous jobs as a farm hand and as a stockboy in a grocery store. He stated he was never fired and described a good working relationship with his superiors and peers. He quit his job in the grocery store to join the USMC.

d. **Military Service:** Tharpe enlisted into the Marine Corps in January 1979, in the Delayed Entry Program, for a period of 4 years. He enlisted to "get away, get away from the atmosphere I was in." He went on active duty in February 1979, when he went to basic training at MCRD, Parris Island, South Carolina. He completed basic training in May

DD FORM 1478  REPLACES DD FORM 464-1, 1 MAR 51, WHICH IS OBSOLETE.    S/N 0102-LF-001-4780

| PRISONER'S SUMMARY CONTINUATION SHEET | | DATE PREPARED | PAGE NO. | NO. OF PAGES |
|---|---|---|---|---|
| [X] ADMISSION SUMMARY  [ ] PROGRESS SUMMARY | | 890615 | 4 | 5 |
| ORGANIZATION JFB, Camp Hansen, FPO Seattle, Washington 98773-5013 | | DEPARTMENT OF MILITARY SERVICE USMC | | |
| LAST NAME · FIRST NAME · MIDDLE INITIAL Tharpe, Carl W. | | SSN 413 11 8668 | | |

d. **Military Service (con't)**: 1979, on time, with no problems, although he indicated he did have some problems academically, but was not sent back in training. Tharpe felt he was an average recruit and probable would have graduated basic training with a meritorious promotion, had he not had some problems with academics. Tharpe was sent to Basic Military Police/Corrections School at Ft. McClelland, Alabama, which he completed on time, with no problems. In July 1979, he was sent to his 1st duty station at Ft. Leavenworth, Kansas, where he was assigned to duties as a Correctionsman at the Disciplinary Barracks. In March 1981, Tharpe was sent to Camp Butler, Okinawa, Japan. In April 1982, Tharpe was transferred to Camp Lejuene, North Carolina where he remained until January 1983. He was than transferred back to Ft Leavenworth, Kansas where he remained until February 1987. In March 1987, Tharpe was transferred to Camp Pendleton, California. Tharpe worked in the Corrections Field the entire time in the Marine Corps, up until March 1988, when he was given a General Court-Martial for indecent exposure, at which time, upon completion of his confinement he was transferred to his present command. He is currently on a 6 month unit deployment. Tharpe indicated he got along very well with his superiors and peers at every command he was assigned. He emphasized that his superiors always helped him out, keeping him from getting "fryed." Tharpe stated his present command does not know him that well and that he has been assigned to them since February 1989. Tharpe stated his Corrections MOS was taken away from him after he was convicted by the general court-martial and was sent to Motor Transportation School after his release from the brig. Tharpe believes his average Proficiency and Conduct Marks are in the area of 4.5, 4.5. He states he "loves the Marine Corps" but does not want to stay in, because of the disciplinary problems, feeling that he could not do the Corps any good.

e. **Present Situation and Adjustment**: Tharpe is currently billeted within segregation maximum custody, due to the seriousness of the offense and being suicidal. Tharpe admits to his alledged confining offense, citing he is glad he has been caught and it is all over. He does not hold any resentment toward his command or the military for his present circumstances. He openly states he is unsure of his own stability and that suicide is a definite possibility at this point. He states if he has hurt his daughter and cannot be of any financial help to his family, he would end his pain. Tharpe did not indicate he had any immediate problems to be taken care of, although he was very concerned about how his stepdaughter was going to handle his incarceration.

**. EVALUATION AND PLANNING**

a. **Impression Based on Personal History**: Tharpe appears to be a very unstable, immature, and irresponsible individual of below average intelligence. His past history does not reveal that he is violent or criminally devient, but he was constantly subject to incest and sexual misconduct throughout his childhood, that is not normal or accepted in todays society. Tharpe feels that he is "just like my father." He admits to being a sick individual who needs help. It appears that Tharpe is very much in love with his stepdaughter, which is evident by the way he talks about her and constantly relates back to her when he talks. Tharpe was polite, cooperative, and respectful during this interview. Content would usually get back to his stepdaughter or his family during childhood. Affect ranged from indifference to rage. Tharpe, at times, would cry and shake, when talking about his childhood and his daughter. Tharpe appears to be very concerned, if not jealous, when talking about his stepdaughter. Tharpe appeared to be in an indifferent mood, which he does not care about what will happen to him. He would be talking about

DD FORM 1478   REPLACES DD FORM 464-1, 1 MAR 91, WHICH IS OBSOLETE.   S/N 0102-LF-001-478

| PRISONER'S SUMMARY CONTINUATION SHEET | | DATE PREPARED | PAGE NO. | NO. OF PAGES |
|---|---|---|---|---|
| ☒ ADMISSION SUMMARY  ☐ PROGRESS SUMMARY | | 890615 | 5 | 5 |
| ORGANIZATION  JFB, Camp Hansen, FPO Seattle, Washington  98773 | | DEPARTMENT OF MILITARY SERVICE  USMC | | |
| LAST NAME, FIRST NAME - MIDDLE INITIAL  Tharpe, Carl W. | | SSN  413 11 8668 | | |

a. Impressions Based on Personal History (con't): his family or his stepdaugher, appearing to be remenicing in a happy manner then was subject to instant anger. Tharpe does not appear to be a disciplinary problem, but is a definite suicide risk and escape risk.

b. Nueropsychiatric: Tharpe is schedule to see the Brig's Psychiatrist on 890616.

c. Medical: No problems stated or noted at this time.

d. Religious: Services are offered on a weekly basis.

e. Custodial: Remain as is, maximum custody, suicide risk.

f. Education, Training, and Work: Tharpe is not eligible to work and should remain in segregation. Unit has indicated he will be transferred to CONUS in approximately 14 days to stand trial pending the outcome of this investigation. He has requested psychiatric help and has been referred to the Brig's Psychiatrist for evaluation.

R. A. PUFNOCK
SSGT      USMC
COUNSELOR

DD FORM 1478    REPLACES DD FORM 464-1, 1 MAR 51,  WHICH IS OBSOLETE.    U.A. GPO. 1982    S/N 0102-LF-001-478

WISS, Judge (dissenting):

I believe that the majority has overlooked certain critical issues that are presented in the two questions before us and, as a result, has missed an opportunity to provide decisional guidance on an important question involving appellate substantive and procedural rights. Therefore, I must dissent from that opinion and its affirmance of the decision below.

## I

Appellant faced life in prison on multiple charges of despicable sexual misconduct over 3 years with his young stepdaughter who, at the time of trial, was only 10 years old. After findings had been entered on appellant's pleas of guilty, the only evidence that defense counsel presented in appellant's behalf during sentencing proceedings had to do with appellant's good military character—nothing at all to help explain his misconduct, as aberrant as it was.

Notwithstanding, defense counsel's sentencing plea was that appellant needed extended therapy, not extended confinement. Not surprisingly, however, the military judge was not responsive and, instead, sentenced appellant to 75 years' confinement (subsequently reduced by the convening authority, pursuant to a pretrial agreement, to 12½ years).

When the case reached the Court of Military Review, appellate defense counsel reviewed the report of a pretrial sanity board that had considered appellant's mental status under RCM 706, Manual for Courts-Martial, United States, 1984. This review led her to request trial defense counsel's case file, in which she noticed several psychiatric and psychological reports that contained references to sexual disorders and to appellant's possibly having been a victim of childhood sexual abuse.

For instance, just 3 days before this court-martial, a psychological evaluation of appellant that had been prepared by Dr. Stubbs, a psychologist who had examined appellant at the request of the defense, contained this statement: "While he denied conscious knowledge of any molest of his own there is strong support both in the interview and the testing data to forward the hypothesis that he was the victim of some significant physical, emotional and sexual abuse." A year earlier—on August 5, 1988—the psychiatric department of Naval Hospital, Camp Pendleton, did an evaluation on appellant in which he had checked off "sexually abused" as one of his "past" experiences.

Appellate defense counsel found herself in a quandary concerning what, if anything, these materials might suggest regarding effectiveness of trial defense counsel's representation during the sentence proceedings. She was aware of the frequently observed point that a significant factor in the background of most child sexual abusers is their own abuse as a child.[1] As a non-expert in the medical field, however, counsel felt unqualified to interpret much of the testing data which she came across or to comprehend significant parts of the evaluation reports or to understand what appeared to be inconsistencies in testing results.

Most importantly, she felt professionally unequipped to evaluate this material, some of which seemed to suggest an important factor that might have offered some psychological explanation for appellant's devi-

---

1. *See, e.g.,* Note, *A Matter of Trust: Institutional Employer Liability for Acts of Child Abuse by Employees,* 33 William & Mary L.Rev. 1295, 1298 n.25 (Summer 1992) ("In general, abused children become abusive and dysfunctional adults."), *citing* T. Reidy, "The Aggressive Characteristics of Abused and Neglected Children," *Child Abuse: Commission and Omission* 471 (J. Cook and R. Bowles eds., 1980); Hagen, *Tolling the Statute of Limitations for Adult Survivors of Child Sexual Abuse,* 76 Iowa L.Rev. 355, 359–60

(Jan.1991) ("Sexually victimized children often continue the cycle of sexual abuse in their adult lives by marrying abusive spouses or by victimizing their own children." (footnote omitted)), *citing* J. Renvoize, *Incest: A Family Pattern* 90 (1982) (child incest victims have "strong likelihood" of themselves becoming adult incest abusers); R. Flowers, *Children and Criminality: The Child as Victim and Perpetrator* 92 (1986) (abused children become abusive adults).

ant conduct that, in turn, might have had relevance in the determination of appellant's sentence—namely, appellant's own sexual victimization as a child. Counsel was mindful of her responsibilities as an officer of the court not to raise frivolous issues that lack substantial foundation, as well as a concern to not treat lightly an allegation of professional ineffectiveness against a colleague. She believed that, unless she received expert assistance in evaluating the medical materials, she would be unable to responsibly determine whether she should raise, on appellant's behalf in the Court of Military Review, an issue questioning the adequacy of trial representation.

Based on her study of this Court's opinion in *United States v. Toledo*, 25 MJ 270 (1987), *opinion adhered to on recon.*, 26 MJ 104, *cert. denied*, 488 U.S. 889, 109 S.Ct. 220, 102 L.Ed.2d 211 (1988), and the opinion of the Navy–Marine Corps Court of Military Review in *United States v. Huerta*, 31 MJ 640, 643 n.1 (1990), counsel believed that she "must first seek assistance from government resources in the local area. This [she] proceeded to do . . . ." She began by calling the Command Staff Judge Advocate at Naval Hospital, Bethesda, "to see if anyone on the hospital staff was qualified in child sexual abuse cases." She was given the name of one psychologist who then was on staff at the hospital. However, after conversing with that doctor and telling him "the non-confidential" aspects of the case, the doctor told counsel "that he did not feel qualified to give [her] the required assistance." He, in turn, gave her the names of three psychologists "whom he felt were more qualified."

The first of these three, because of her position with a local foundation, informed counsel that she was "not available for consultations . . . ." Counsel was unable to reach the second one when she telephoned. She did, however, have more luck with the third—Lieutenant Commander Vladimir Nacev, who then was assigned to the Navy's Family Advocacy Program in Washington, D.C. Defense counsel makes these representations about Dr. Nacev's potential contribution to her dilemma:

> My discussions with LCDR Nacev have convinced me that he has sufficient experience in the area of child sexual abuse to enable him to provide the consultation I require. LCDR Nacev informs me he is available and willing to assist me, however, until he is allowed to review the confidential psychological testing data and reports, he is unable to answer my specific concerns.

Naturally, counsel had concerns about revealing confidential material—as well as engaging in candid, confidential conversations with Dr. Nacev—without the blessing of some authority who could assure her that her use of this government personnel resource was permissible and that their exchanges would be confidential. *United States v. Toledo, supra*, teaches the risks that defense counsel run in that regard, given the absence of a doctor-patient privilege in the Military Rules of Evidence.

Accordingly, counsel prudently believed that she needed a determinative decision from an appropriate authority that she was entitled to use of a government resource for expert assistance, *see* 25 MJ at 276, and that her use would be within the scope of the lawyer-client privilege under Mil. R.Evid. 502(a), Manual, *supra*. She reasonably viewed this as preferrable to simply striking out on her own, unsupported with official sanction, to commandeer a government resource and run the risk that, later, an appellate court might conclude that she acted improperly and, so, the confidences may be pierced. After all, this very Court has warned that "a servicemember has no right simply to help himself to government experts and bring them into the attorney-client relationship, bypassing the proper appointing authorities." 25 MJ at 276.

Thus, she turned to the Court of Military Review and asked for an order for expert assistance and for confidentiality. She did so, relying on the following language from footnote 1 of the *Huerta* opinion out of that same court less than 3 months earlier:

To obtain expert assistance prior to the referral of charges to a court-martial, we believe that although it may be cumbersome, defense counsel, at a minimum, must demonstrate to the convening authority that (1) working through their own resources, they have exhausted the possibilities for Government assistance within their particular geographic location, (2) establish that their further communication with a potential Government expert assistant would necessarily compromise client confidences, and (3) formally request of the convening authority, with the proper showing of necessity and relevance, that the expert assistance provided be rendered under an order of confidentiality. Once charges have been referred to trial, application for expert assistance may be made to the military judge, followed by a defense-requested continuance to prepare for trial with that assistance.

Extrapolating from that language, the Court of Military Review seemed to counsel to be the appropriate authority from whom to seek a determination both that she was entitled to a government resource for expert assistance and that her relations with that resource would be confidential within the confines of the lawyer-client privilege.

The Court of Military Review, however, denied her motion after oral argument thereon and denied, as well, her motion for reconsideration *en banc*. Thereafter, appellant petitioned this Court for a writ of mandamus to order the Court of Military Review to issue the requested order, but we denied the petition without prejudice to raise the matter in the normal course of appellate review.

At that point, appellate defense counsel proceeded as best she could, raising in her brief in the Court of Military Review the issues on which she had sought expert assistance to evaluate whether they should be raised and, if so, how. As is clear by

now, however, her efforts were unsuccessful, for the Court of Military Review affirmed the convictions and the approved sentence.

## II

In this Court, appellate defense counsel has carried on with her efforts to convince appellate authorities that appellant received inadequate representation during his trial proceedings. As well, she confesses that she is hampered in carrying her burdens in that regard by the absence of expert assistance, and so she has raised, too, the question whether the Court of Military Review erred in denying her motion for assistance and for confidentiality. The majority has turned a cold shoulder to both issues. In doing so, however, I believe that several aspects of the opinion overlook certain realities of appellate practice from the viewpoint of the practitioner.

## A

I will write only briefly as to the first issue, relating to effectiveness of representation during the trial proceedings, in part because I do not believe that that issue is fully ripe for our consideration, *see* this opinion, *infra*. I minimally discuss this issue only to the extent necessary to establish the framework within which to consider why appellate defense counsel believed it was necessary to obtain expert assistance to help her in connection with that issue.

Appellant claims that trial defense counsel was negligent in his representation in this respect: Although counsel had in his case file documents—including the glaring report from Dr. Stubbs, a portion of which I quoted earlier (38 MJ at 27)—that contained suggestions that appellant had been the victim of child sexual abuse, *counsel apparently neither noticed those suggestions*[2] nor, of course, investigated their

---

2. The majority challenges my basis for representing in this regard the nature of appellant's claim and, in turn, any basis of support for that claim. 38 MJ at 11. As to the former, it is quite

clear from appellant's brief: "Trial defense counsel's *failure to recognize and investigate* the issue of appellant's history of childhood sexual abuse resulted in the military judge's unaware-

potential importance. *See United States v. Scott*, 24 MJ 186 (CMA 1987). This focus on what is the precise nature of appellant's complaint against his trial defense counsel points up a critical defect in the majority's use here of the usual practice of not second-guessing reasonable tactical decisions by defense counsel. It would seem that the decision not to pursue the potential use of appellant's childhood experiences—either because they ultimately could not be documented satisfactorily or because medically it would offer insufficient explanation to motivate a lenient sentence—could not be rubber-stamped as tactically reasonable when apparently *there was no decision made* due to unawareness of what was in the case file.

I make these brief comments on appellant's claim of ineffective assistance of trial defense counsel only to bring into focus my differences with the majority's view of that claim and the appropriate analysis of it. However, I do not believe that that issue is ripe for decision now, in light of appellate defense counsel's assertion that she needed—and impliedly still does need—expert assistance upon which she can weigh the credibility of such an issue and, if credible, upon which she can frame and pursue such an assertion of error.

### B

"It is well established that ... an accused is entitled to the assistance of an expert to aid in the preparation of his defense" and that the standard for when such an expert must be afforded is "upon a proper showing of necessity." *United States v. Burnette*, 29 MJ 473, 475 (CMA), *cert. denied*, 498 U.S. 821, 111 S.Ct. 70, 112 L.Ed.2d 43 (1990); *see Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53

(1985). Moreover, again on a proper showing of necessity, expert assistance in preparation of an appeal may be ordered. *See, e.g., United States v. Curtis*, 31 MJ 395 (Daily Journal CMA 1990).

It is imperative to state with clarity what truly is in issue here: Did appellate defense counsel make a showing of necessity for expert assistance to prepare her appeal; and, if so, what was the proper response of the Court of Military Review? What is *not* in issue is the need for an order of confidentialty. Once a court of law orders that expert assistance is necessary to prepare a case, whether at trial or on appeal, then the expert becomes a part of the defense team and is as enshrouded by the lawyer-client privilege as is the lawyer herself. *See United States v. Toledo, supra* at 275–76; Mil.R.Evid. 502(a).

Recall, however, that appellate defense counsel's motion was not limited to an order for confidentiality, but it extended also to an order for provision of expert assistance. Without a proper authority's ruling that the defense is entitled to an expert, counsel would not seem free to round one up, whether that expert was " 'ready, willing, and able to provide the required assistance.' " *See United States v. Toledo, supra* at 276.

### Showing of Necessity

In *United States v. Burnette*, 29 MJ at 475, this Court stated: "As to the instant case, we agree that very little, if any, showing of necessity was required to entitle the defense to expert assistance in the interpretation of drug analyses." I infer from this that, at least where complex, technical, scientific evidence is at issue— material that is well outside the usual ken

---

ness of, and thus inability to consider, significant extenuation evidence. This constituted unreasonable and ineffective representation." Final Brief at 10 (emphasis added). As to whether there might be any support for such a claim when and if that claim later becomes ripe for adjudication, I simply point this out: In the affidavit that he furnished to rebut the attack on his representation in the Court of Military Review, trial defense counsel detailed his view of

the nature of and the vulnerabilities to use of the psychological evidence that was in his case file; yet he never mentioned the matter in that evidence that suggested appellant's possible childhood sexual victimization. Thus, while he offers explanation for not using aspects of that evidence, his affidavit offers no suggestion that he was even aware of the matter in that evidence that appellant has focused on during his appeal.

of an attorney—"necessity" is shown where that evidence is material to the case.

It may be that "necessity" in this connection is like probable cause—it depends on a variety of factors in the context of the concrete case at bar. In addition to the nature of the problem that I just mentioned, some additional potentially influential factors that come to mind include a good-faith representation of need by appellate counsel as an officer of the court, the bona fide appearance of an issue actually in the case for which the expert is requested, and the reasonableness of the request for assistance (one measure of which might be whether a *prosecutor* who had such a piece of evidence in his hand could easily call up an expert and ask what it meant).

I believe that, against these guidelines, necessity was demonstrated to the Court of Military Review. Appellate defense counsel contended that the issue in question and the material relating to it was so technical and complex that she, as a non-expert in the field, was unable to comprehend and evaluate it. Only with expert assistance could she apply her legal expertise to decide whether a legitimate appellate issue was presented and what would be the most successful way to litigate that issue. Without it, she was shooting in the dark.

### Response of the Court of Military Review

It is the charge of the Court of Military Review to ensure due process on appeals pending before it. Where a showing of necessity for expert assistance in the prosecution of an appeal is made to the court, it must take any and all reasonable steps to assure that such assistance is provided.

Usually, this responsibility will be satisfactorily discharged by promulgating an order directing appropriate authorities to furnish defense counsel with the requisite expert assistance. Counsel, with such an order in hand, then has all she needs to obtain such assistance and to ensure that the expert is within the lawyer-client privilege. If and when counsel is rebuffed in her efforts to seek compliance with the order, however, she may return to the Court of Military Review for appropriate relief. *Cf. United States v. True*, 28 MJ 1, 4 (CMA 1989) (Military judge ordered convening authority to provide defense with expert assistance; when convening authority refused, military judge abated the proceedings in accordance with RCM 703(d)).

### III

On the basis of this reasoning, I conclude that the refusal of the Court of Military Review to ensure necessary expert assistance, as appellate defense counsel had requested, compromised the ability of the defense to properly evaluate, frame, and litigate the issue of adequacy of trial representation. I would set aside the decision of the Court of Military Review and remand the case to that court. I would direct the court to issue whatever order was appropriate consistent with these views in order to permit appellate defense counsel to associate with an expert to assist her in adequately preparing her appeal. Then, under Article 66, Uniform Code of Military Justice, 10 USC § 866, counsel could file in that court whatever appellate issues that seemed legitimate in light of that consultation, with ultimate opportunity for appellant to petition for review by this Court under Article 67, UCMJ, 10 USC § 867.