**UNITED STATES, Appellee,**

v.

**Hector L. TOLEDO, Seaman Recruit,
U.S. Navy, Appellant.**

No. 54,817.
NMCM 85 3868.

U.S. Court of Military Appeals.

Dec. 14, 1987.

For Appellant: *Lieutenant Colonel Richard E. Ouellette, USMC* (argued).

For Appellee: *Major F.F. Krider, USMC* (argued); *Commander Michael P. Green, JAGC, USN* (on brief); *Captain Carl H. Horst, JAGC, USN* and *Captain Wendell A. Kjos, JAGC, USN.*

## Opinion of the Court

COX, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of one specification of rape, five specifications of indecent assault, and one specification of committing indecent acts on a female under the age of 16, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920 and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 30 years, and total forfeitures. The convening authority suspended confinement in excess of 20 years and otherwise approved the sentence. The Court of Military Review was unpersuaded beyond a reasonable doubt that penetration had occurred and reduced the rape specification to committing indecent acts upon a child under the age of 16, a violation of Article 134. Upon reassessment of the sentence, the court reduced the period of confinement to 15 years but otherwise affirmed the sentence as adjudged.

We granted review of the following issues:

### I

WHETHER THE MILITARY JUDGE ERRED BY AUTHORIZING THE PROSECUTION TO PRESENT AN EXPERT WITNESS TO OFFER HIS OPINION ON APPELLANT'S TRUTH AND VERACITY.

### II

WHETHER THE MILITARY JUDGE ERRED BY AUTHORIZING THE TESTIMONY OF AN EXPERT WITNESS CONCERNING A CHILD–ABUSE VICTIM'S CREDIBILITY.

### III

WHETHER THE MILITARY JUDGE ERRED BY ADMITTING TESTIMONY OF A CLINICAL PSYCHOLOGIST IN VIOLATION OF ARTICLE 31(b)[, UCMJ, 10 U.S.C. § 831(b) ].

Finding no error to the substantial prejudice of appellant, we affirm. Art. 59(a), UCMJ, 10 U.S.C. § 859(a).

Of the granted issues, only a portion of the first issue requires substantial discussion. In order to resolve it and the other issues, however, a detailed description of the evidence is necessary.

When appellant first arrived for duty in Misawa, Japan, he was befriended by Petty Officer Arnardo Serrano. As Serrano testified: "He [appellant] was new in the command. He didn't know anybody. And he was—he felt lost, so I was just trying to make him feel at home." Appellant accepted the invitation and became a frequent visitor to the Serrano home, where he often played with the three young Serrano children. One of the reasons the Serranos let appellant play with their children so much was that appellant often told them how much he missed his adopted younger sister who was back home.

On the evening of November 6, 1984, appellant was at the Serrano home with Petty Officer Serrano and the children. Mrs. Serrano had gone to a baby shower. Serrano was involved in connecting some video equipment when it was time for the children to bathe and get ready for bed. Appellant insisted on going with them and, even though Serrano "was a little uncomfortable" about it, he let him. Periodically, Serrano would check in to make sure everything was all right.

After the bath, appellant commenced reading bedtime stories to the children in

their rooms. Following one unusually long period of silence, Serrano again went upstairs to see what was happening. Peering into his 5–year-old daughter's room, he discovered a sickening scene. The child was sitting at the edge of her bed, leaning backward, with her panties pulled down. Appellant stood directly in front of her "with his pants open." At trial, Serrano testified:

> Toledo ... turned away, and ... walked towards the corner. He had his hands in front of him. I did not see his penis, but I saw a pubic hair, I saw his pubic hair. ... [Toledo] quickly turned away and started to zip his pants. I said, "What the hell is going on here?". I yelled. And my daughter answered, "Toledo was only scratching." ... She stood there ... [with] a terrified look on her face, and she was shaking.

Serrano further testified as follows:

> Q. Will you describe for the members what was he doing in the corner, could you observe him from the corner?
>
> A. He was fixing his pants, trying to fix his pants, put on his belt. I—I stood there after I—I asked what was going on, and my daughter said he was only scratching himself, I just stood there for a few seconds, and I couldn't believe what was going on. He was—he just had turned, and he was over there fixing his pants, he was just buckling them up, zipping them up and everything.

In response to Serrano's yell:

> He [appellant] didn't say anything. He just turned away with his head down, that's when he started fixing his pants. Then I just—I yelled—I yelled out again, I said, "Get the hell out of my house. I never want to see you near my kids. I never want to see your face again." And Toledo walked out of the door, he was still fixing his pants.
>
> Q. Did he—did he say anything to you?
>
> A. He never said a word. He never even looked at me. There was never any eye contact.

> Q. Could you describe his appearance at the time he left the room?
>
> A. He was—he was sweating profusely. He was soaked, he was drenched in sweat. And he just slowly walked out of the—out of the room.
>
> Q. To the best of your memory, what—what was the temperature, what were the climatic conditions—
>
> A. Oh, it was cold that night, it was really cold that night. It was in November. It was pretty cold.

As appellant was leaving, Serrano instructed him to report to his barracks, and he informed him that he would be calling the Shore Patrol. Rather than walking in the direction of the barracks, appellant headed straight for the main gate. Several hours later, he was apprehended off base. His clothing was seized; laboratory analysis revealed the presence of a large semen stain on his underpants.

Approximately 3 months later, the victim testified at an Article 32, UCMJ, 10 U.S.C § 832, session. Her testimony was videotaped, and a verbatim transcript was prepared. At trial, the defense agreed that the victim was unavailable to testify and that there had been an adequate opportunity to cross-examine her at the Article 32 hearing. Further, the defense did not wish to have her testify in person. Accordingly, the videotape recording of the victim's prior testimony was played for the court members pursuant to the former-testimony exception to the hearsay rule, Mil.R.Evid. 804(b)(1), Manual for Courts-Martial, United States, 1984.

In her testimony, the girl described the events of the evening, including her mother's departure for the baby shower, the bath in which appellant participated, and the bedtime stories. She also stated that on two occasions that evening appellant put his "pee pee" "[o]n ... [her] pee pee and poo poo." One of these incidents occurred "[t]he first time he had came upstairs"; the other occurred when he read the story.

The girl also stated that, on a previous occasion, appellant had taken the three children to his "house" (the barracks), and he

had done the same thing to her there in the bathroom with the door locked. On that occasion it also hurt when he "[p]ut his pee pee in ... [her] pee pee." When she complained of the pain to appellant, "[h]e started doing it some more." According to her testimony, appellant had also touched her "pee pee" with his hands many other times while at her house and had hurt her.[1]

The victim's brother, Ryan, age 7, testified at the trial and corroborated her account of being taken to appellant's barracks. He also confirmed that he and his younger brother stayed in appellant's room watching cartoons on television. His sister, however, had to go to the bathroom. Appellant took her—alone—and they stayed for a "[l]ong time." Petty Officer Serrano testified that he had never given appellant permission to take his children away from their house.

Appellant testified in his defense and admitted taking the children to his barracks without the knowledge or consent of either Petty Officer or Mrs. Serrano. His explanation was: "The Mama-san did say that it was okay by her." He also acknowledged taking the victim to the bathroom on that occasion but denied that he had "ever raped or sodomized or in any way sexually assaulted or abused" her.

Appellant's version, on direct examination, of the alleged incident at the house was that he "had noticed that ... [the child] had been scratching herself right through the night." After the bath,

> she was complaining that her—her sides were itching. So, I told her, you know, "let me see before I tell your dad," which at the time—that's when her dad came in the house. He came upstairs.

On cross-examination, appellant agreed that, when Serrano walked in, the girl was sitting on the bed, "her gown was up to her chest, ... [a]nd her pants were down around her knees." He also admitted:

I touched her in the area where she was complaining about, which was her vagina, and that was about 2 seconds, just to see if she was really hurting. She told me yes. When I turned around to get her father, he was already coming in.

He denied ever having his pants down or open, turning away to buckle or fasten his pants, or masturbating. He claimed that it was the victim who stated, at the time her father burst in, that she was scratching herself. His explanation for the semen in his underwear was that, after he left the Serrano household, he went into town and had sexual intercourse with a woman he knew who worked at a club. On cross-examination, he amplified his explanation thusly:

> Q. Do you want to explain how your underwear had a large stain as a result of ejaculation?
>
> A. I thought I covered that clearly. I was out with a couple of girls that night, I did not shower after we had sex, and that was it.
>
> Q. Are you in the habit of ejaculating in your underwear when you have intercourse with women?
>
> A. Well, that night, I didn't see any reason, you know. Just once in a while, we just go and do it that way.
>
> Q. Do you always have intercourse with women with your underwear on?
>
> A. Once in a while, yes.
>
> Q. Do you want to explain how it's possible to ejaculate into your underwear and have sexual intercourse at the same time?
>
> A. That's very simple. All you got to do is have sex with a girl, pull out whenever you feel like it.

In response to a question by the military judge about whether appellant had "ejaculated with" his "undershorts on," appellant replied:

---

1. For sentencing purposes, the military judge treated the specifications as only three offenses, grouping them around the events alleged to have occurred between December 25, 1983, and November 5, 1984 (at appellant's barracks); those that occurred at about 9:00 p.m., November 6, 1984 (the first incident at the house); and those that occurred at about 9:50 p.m. (the incident that Petty Officer Serrano walked in on).

No, sir. I did not say that. I simply stated that you just pull out before you ejaculate. It was getting late that night and I just wanted to go home. I just wanted to go see what was going on on base, turn myself in.

Previously, appellant had explained that he knew the Shore Patrol was looking for him because Serrano said he would call them. On recross-examination, he identified his alleged sex partner as a female named "Hiromi" and stated that he had known her since he had been in Misawa. He did not produce her, otherwise identify her, or request her as a witness at the court-martial.

■ With particular regard to the granted issues, the prosecution, during its case-in-rebuttal, apparently stunned the defense by calling as a witness Dr. (Captain) Paul E. Rosete, USAF, a clinical psychologist. The defense objected to Dr. Rosete's testimony on the grounds of privilege. Defense counsel explained that he previously approached Dr. Rosete in confidence and requested that the doctor examine appellant with a view to determining "whether or not there were any possible problems concerning sanity." Counsel never requested that Dr. Rosete be appointed to examine appellant or to assist in the defense. Privately, however, he asked of Dr. Rosete "that the conclusions, reports, notes, and tests be kept in strict confidence and that they be released to none other than myself or the accused." Counsel's

rationale was that this preliminary sort of "check into the mental competency of the accused" was a necessary or desirable predicate to requesting a formal sanity board. On this basis, counsel contended that the Government should be precluded from calling the doctor as a witness, citing Mil.R.Evid. 706.[2]

In response, trial counsel assured the judge that he did not intend to elicit from the doctor any opinion regarding appellant's sanity or lack thereof; his purpose in calling the witness was merely to present his opinion of appellant's "character for truth and veracity," inasmuch as appellant had put such in issue by testifying, and to provide rebuttal for certain of the assertions made by appellant in his testimony. Counsel cited *United States v. Parker*, 15 M.J. 146 (C.M.A.1983), and *United States v. Matthews*, 13 M.J. 501 (A.C.M.R.1982), rev'd in part on other grounds, 16 M.J. 354 (C.M.A.1983), as authority, and the military judge permitted the testimony for these purposes only.[3]

Dr. Rosete then confirmed that defense counsel requested the confidential evaluation and that he interviewed appellant for approximately 10–12 hours.[4] In addition to discussing the alleged offenses with appellant, which appellant steadfastly denied, the doctor probed appellant's sexual history extensively. At no time during the course of these conversations did appellant ever mention having engaged in sexual in-

---

2. Mil.R.Evid. 706, Court appointed experts, provides:

(a) *Appointment and compensation.* The trial counsel, the defense counsel, and the court-martial have equal opportunity to obtain expert witnesses under Article 46 [,UCMJ, 10 U.S.C. § 846]. The employment and compensation of expert witnesses is governed by R.C.M. 703.

(b) *Disclosure of employment.* In the exercise of discretion, the military judge may authorize disclosure to the members of the fact that the military judge called an expert witness.

(c) *Accused's experts of own selection.* Nothing in this rule limits the accused in calling expert witnesses of the accused's own selection and at the accused's own expense.

Both Article 46 and R.C.M. 703 deal exclusively with the production of witnesses and evidence

at trial; no privileges are supplied by these provisions.

3. The military judge's exact ruling was:

I will permit the testimony of the witness only as to two particular areas. That would have to do with the sexual history as explained to him by Seaman Recruit Toledo and he may also offer his opinion as to the truth or veracity of Seaman Recruit Toledo, if in fact a sufficient foundation can be laid for him to offer such an opinion.

4. In view of the absence of testimonial privilege, see text infra, Dr. Rosete had no choice but to appear as a witness as directed and to respond to the questions of counsel and the military judge.

tercourse with a woman named Hiromi or anyone else on the evening of November 6, 1984.

Literally, it does not seem to matter whether appellant had sex with Hiromi or how the semen stain came to be on his underpants, considering the circumstances under which he was discovered, his admissions about his conduct with the victim, his admission of having previously removed the children from the home without the parents' knowledge or consent, the testimony of the children, and appellant's version of the events which, as the Court of Military Review aptly put it, "strained credulity." Unpub. op. at 3. However, giving appellant the maximum benefit of the doubt, if any shred of reasonable doubt was left after his testimony, it was obliterated by Dr. Rosete's devastating rebuttal testimony. Therefore, out of an abundance of caution, we consider the propriety of Dr. Rosete's rebuttal testimony.

The Military Rules of Evidence recognize no doctor-patient privilege *per se.* Mil.R. Evid. 501(d) provides:

Notwithstanding any other provision of these rules, information not otherwise privileged does not become privileged on the basis that it was acquired by a medical officer or civilian physician in a professional capacity.

*See also* Analysis of the Military Rules of Evidence, Manual, *supra* at A22–31.

Mil.R.Evid. 706, cited by the defense at trial, is not itself of assistance to appellant. *See* n. 2, *supra.* On the other hand, Mil.R. Evid. 302, "Privilege concerning mental examination of an accused," does limit, with certain exceptions, disclosure of statements by an accused during certain mental examinations. In pertinent part, the general rule states:

The accused has a privilege to prevent any statement made by the accused at a mental examination *ordered under R.C.M. 706* and any derivative evidence

obtained through use of such a statement from being received into evidence against the accused on the issue of guilt or innocence or during sentencing proceedings.

(Emphasis added.) The problem for appellant, of course, is that Dr. Rosete was not ordered to examine him under R.C.M. 706 or any other provision. Quite the contrary, the defense was apparently seeking to avoid tipping its hand at this juncture of trial preparation.[5] Thus, Mil.R.Evid. 302 provides no haven for appellant.

▆ Ironically, there is a rule of evidence that might have permitted appellant to utilize the services of Dr. Rosete without risking disclosure of his statements—the lawyer-client privilege, Mil.R.Evid. 502(a). That rule provides, *inter alia,*

a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between the client ... and the lawyer or *the lawyer's representative.*

The "'representative' of a lawyer" is defined as "a person *employed by or assigned to* assist a lawyer in providing professional legal services." Mil.R.Evid. 502(b)(3) (emphasis added). The drafters of the rule identified, nonexclusively, paraprofessionals and secretaries as possible representatives of lawyers. Analysis, Manual, *supra* at A22–31.

There is federal authority, however, that psychiatrists—and arguably psychotherapists in general—employed by or appointed for the defense to assist in the preparation of an insanity defense, fall within the attorney-client privilege, at least where such privilege is not waived by tendering an insanity defense. *United States v. Alvarez,* 519 F.2d 1036 (3d Cir.1975); *United States ex rel. Edney v. Smith,* 425 F.Supp. 1038 (E.D.N.Y.1976), *aff'd,* 556 F. 2d 556 (2d Cir.1977). The psychiatrist's

---

**5.** The Government's theory is that the defense wanted to avoid a sanity board unless they could be assured in advance of favorable results. Thus the Government would not have

access to expert opinion that appellant was perfectly sane, thereby undermining the defense's sentencing theme that appellant was just "a sick man."

(psychotherapist's) place on the defense team to "conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense" of insanity is now established beyond cavil. *Ake v. Oklahoma,* 470 U.S. 68, 83, 105 S.Ct. 1087, 1097, 84 L.Ed.2d 53 (1985).

Had the defense requested that the Government provide it a medical officer for assistance in the preparation of its case, and had the Government failed to do so, we would have concluded, under *Ake,* that appellant had been deprived of "[m]eaningful access to justice," given the circumstances in which appellant was discovered by Petty Officer Serrano. *Id.* at 77, 105 S.Ct. at 1094. However, requesting this assistance would have resulted in that very tipping off of the Government that the defense apparently did not desire.

Had the defense procured medical assistance for the preparation of its defense at its own expense, we would have held that communications between appellant and that expert were within the attorney-client relationship, at least unless a mental-responsibility defense were presented. *E.g., United States v. Alvarez, supra.* However, here the defense tried to commandeer a government official. As the Supreme Court observed in *Ake:*

> This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed.

470 U.S. at 83, 105 S.Ct. at 1097.

By the same token, a servicemember has no right simply to help himself to government experts and bring them into the attorney-client relationship, bypassing the proper appointing authorities. Indigency, of course, is not a prerequisite to expert assistance in the military. Art. 46, UCMJ, 10 U.S.C. § 846. To be sure, appellant has not claimed, either at trial or on appeal, that an attorney-client privilege existed with respect to Dr. Rosete, and under the

circumstances we also find none. *Cf. United States v. White,* 617 F.2d 1131 (5th Cir.1980). Accordingly, this aspect of the issue is without merit.

■ The remaining issues may be resolved more succinctly. First, trial counsel elicited from Dr. Rosete the fact that he had administered a battery of psychological tests to appellant and that he believed he had "had sufficient contact with" appellant "to form a personal opinion regarding his character for truthfulness." Asked what that opinion was, the doctor replied—nonresponsively:

> I think that given the time that I spent with him and the information that he provided, and the manner in which it was provided, that *he was being less than candid.*

(Emphasis added.) Presumably the lack of candor related to appellant's denial of improper conduct. The defense did not object at trial to either the question or the answer, but now argues that appellant was prejudiced by the doctor's conclusion.

Admittedly, it is not clear whether the question called for Dr. Rosete's expert opinion based on the testing and other professional techniques, Mil.R.Evid. 702–705, or his lay opinion, Mil.R.Evid. 608(a). The Court of Military Review concluded that the testimony was erroneously received, *citing United States v. Cameron,* 21 M.J. 59 (C.M.A. 1985), but harmless given the state of the evidence. Unpub. op. at 3. *See also United States v. Snipes,* 18 M.J. 172, 179 (C.M.A. 1984), and 180 (Everett, C.J., concurring in the result); and *United States v. Cox,* 18 M.J. 72, 73–74 (C.M.A. 1984). Without unravelling the merits of the question, we certainly agree with the court below that the probative force of this testimony was so slight, in comparison with the other evidence that, under the circumstances, appellant could not have been prejudiced. Art. 59(a). Accordingly, no further consideration of the issue is necessary.

■ The next question involves the testimony of Captain Willard W. Mollerstrom, USAF, Chief of Mental Health Ser-

vices at Misawa Hospital, who testified on behalf of the prosecution. Captain Mollerstrom held a Master's Degree in Public Health and a Ph.D. in Social Work, and he had experience "in the area of child abuse." Mollerstrom examined the victim on three different occasions, including the evening of November 6 when she was brought to the hospital. Mollerstrom testified that, on that evening, the victim "was nonverbal" and "very withdrawn, very dependent, very evasive." Appellant objects to Mollerstrom's conclusion that this response was "quite common" in child-abuse cases. He also objects to the Captain's opinion that "she [the victim] is capable of knowing the difference between telling the truth, telling a lie, difference between right and wrong as relating to herself." No such objections were voiced at trial.

Essentially, appellant's complaint on appeal is that the record contains an inadequate foundation for Captain Mollerstrom's conclusions. *See* Mil.R.Evid. 702. As a matter of law, we cannot say that the witness was not competent to draw these conclusions or that his knowledge could not assist the triers of fact. In any event,

inasmuch as the victim's testimony was thoroughly corroborated by other witnesses, Mollerstrom's testimony could not have materially prejudiced appellant, even if it had been erroneously received. Art. 59(a). Further, appellant's failure to challenge the foundation waived his objection on appeal. Mil.R.Evid. 103(a)(1).

■ The final issue is whether Dr. Rosete should have read appellant his Article 31(b), UCMJ, 10 U.S.C. § 831(b), rights before questioning him. It is apparent from this record that Dr. Rosete, who was evaluating appellant at the behest of the defense, was not interrogating appellant or requesting a statement from him within the meaning of Article 31(b). *United States v. Jones*, 24 M.J. 367 (C.M.A.1987). Accordingly, no Article 31 warnings were required, and the issue is without merit.

The decision of the United States Navy-Marine Corps Court of Military Review is affirmed.

Chief Judge EVERETT and Judge SULLIVAN concur.