**UNITED STATES, Appellee,**

v.

**Clayton D. KASPERS, Specialist,
U.S. Army, Appellant.**

No. 96–0730.
Crim.App. No. 9301618.

U.S. Court of Appeals for
the Armed Forces.

Argued April 2, 1997.

Decided Sept. 23, 1997.

For Appellant: *Captain Stephen P. Bell, Jr.* (argued); *Colonel John T. Phelps, II, Lieutenant Colonel Michael L. Walters,* and *Captain Norman R. Zamboni* (on brief); *Colonel Stephen D. Smith* and *Captain Michael E. Hatch.*

For Appellee: *Colonel John M. Smith* (argued); *Lieutenant Colonel Eva M. Novak* and *Major Lyle D. Jentzer* (on brief); *Captain Thomas N. Auble.*

*Opinion of the Court*

HOWARD, District Judge: [1]

In November and December of 1992, and on various dates in February through August 1993, appellant was tried by a general court-martial, comprised of officer members, on various charges. Contrary to his pleas, he was found guilty of one specification each of conspiracy to commit premeditated murder, premeditated murder, adultery, and obstruction of justice, violations of Articles 81, 118(1), and 134, Uniform Code of Military Justice, 10 USC §§ 881, 918(1), and 934, respectively. The court-martial sentenced appellant to be confined for life, to forfeit all pay and allowances, to be reduced to the lowest enlisted grade, and to be dishonorably discharged from the Army. The convening authority approved the sentence. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion dated March 20, 1996.

On October 30, 1996, we granted review on two issues:

## I

WHETHER THE MILITARY JUDGE ERRED AND ABUSED HIS DISCRETION BY ADMITTING INTO EVIDENCE VIDEOTAPES AND TESTIMONY REGARDING ACCIDENT RECONSTRUCTIONS CONDUCTED BY THE WASHINGTON STATE POLICE BECAUSE SUCH TAPES WERE UNRELIABLE, MORE PREJUDICIAL THAN PROBATIVE, AND INVADED THE PROVINCE OF THE FACTFINDER BY GOING TO THE ULTIMATE ISSUE.

## II

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING THE DEFENSE REQUEST FOR AN *EX PARTE* HEARING REGARD-ING THE NECESSITY FOR APPOINTMENT OF EXPERT ASSISTANCE.

### *FACTS*

Appellant's case was referred as capital; however, he was ultimately convicted of the non-capital, premeditated murder of his wife after a well-litigated and lengthy trial.

As part of the case against appellant, the Government presented the testimony of Detective John Wright, who was a Washington State Police accident-reconstruction expert. Detective Wright conducted several video-taped tests at the crime scene in an attempt to reconstruct the circumstances of Mrs. Kaspers' death. These videotapes were played for the members of the court-martial as part of Detective Wright's testimony during the Government's case-in-chief.

Detective Wright never offered an ultimate opinion as to how Rhonda Kaspers fell off the cliff; rather, he testified as to the results of the reconstruction in order to show the feasibility of the competing theories. Essentially, Detective Wright testified that, as a result of his tests, his calculations indicated the cliff's slope was a "decelerant" that would slow down a sliding object. In layman's terms, he characterized the brushy slope as a "drag surface."

The Government introduced this evidence to contradict appellant's pretrial statement that he saw his wife stumble and slide over the side of the cliff to her death, and to support the Government's theory that Rhonda Kaspers' death was not an accident. Appellant litigated the admissibility of the videotapes in a pretrial Article 39(a), UCMJ, 10 USC § 839(a), session, and he further objected during trial, thereby preserving the issue for appeal.

### *DISCUSSION*

#### I

"If scientific, technical, or other specialized knowledge will assist the trier

---

1. The argument in this case was held at the United States Military Academy at West Point, New York, on April 2, 1997, with advance consent of the parties as part of the Court's Project Outreach program. The Honorable Malcolm J. Howard, Judge of the United States District Court for the Eastern District of North Carolina, sat with the Court for this argument, as authorized by Article 142(f), Uniform Code of Military Justice, 10 USC § 942(f).

of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Mil.R.Evid. 702, Manual for Courts–Martial, United States (1984).[2] Evidence must have some degree of reliability in order to be logically relevant. *United States v. Gipson*, 24 MJ 246, 251 (CMA 1987); *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The military judge considers the admissibility of challenged expert evidence on a case-by-case basis. 24 MJ at 251; 509 U.S. at 592–93, 113 S.Ct. at 2796–97. "Simulated conditions ... need only be 'substantially similar'" to be admissible; "they need not be 'identical.'" *United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir.1992), citing *Estate of Carey by Carey v. Hy–Temp Mfg., Inc.*, 929 F.2d 1229, 1235 n. 2 (7th Cir.1991). We therefore determine whether the judge abused his or her discretion by admitting the challenged evidence. *United States v. Youngberg*, 43 MJ 379, 381 (1995); *United States v. Nimmer*, 43 MJ 252 (1995).

In *United States v. Houser*, 36 MJ 392, 397–98 (1986), this Court articulated several factors that the military judge should weigh and consider in coming to a determination regarding the admissibility of expert evidence. *See United States v. St. Jean*, 45 MJ 435, 444 (1996). One of these factors is the reliability of the proffered evidence—the only factor challenged in this case. *Id.* We must also consider appellant's argument that this evidence was unduly prejudicial and that its admission invaded the province of the factfinders. *See* Mil.R.Evid. 403; *see generally United States v. Banks*, 36 MJ 150 (1992).

The Supreme Court requires that the judge consider all of the surrounding circumstances, including reliability, in making a threshold determination concerning the admissibility of the specialized evidence. *Daubert*, 509 U.S. at 589, 113 S.Ct. at 2795.

Recently, this Court has applied the same approach to admitting new technological, scientific, and other specialized evidence:

The military judge's role as evidentiary gatekeeper does not require him to admit only evidence that he personally finds correct and persuasive and to exclude that which he finds incorrect or unpersuasive. Rather, the judge's role is to screen all evidence for minimum standards of admissibility and to let the factfinder determine which evidence is more persuasive. That appears to have occurred here.

*St. Jean*, 45 MJ at 445.

█ In the present case, the military judge made a threshold determination and issued findings of fact and conclusions of law to support his decision. *See* Appendix. Therefore, we review these findings for abuse of discretion. *See St. Jean*, 45 MJ at 444; *United States v. Scheffer*, 44 MJ 442, 447 (1996); *Houser*, 36 MJ at 397; and *Gipson*, 24 MJ at 251.

█ The question is whether the judge abused his discretion in determining that the probative value of this evidence outweighed any prejudicial effect. *See* Mil.R.Evid. 403. The judge made this finding on the record; therefore, we need only review this decision for an abuse of discretion. *St. Jean*, 45 MJ at 444; *Scheffer*, 44 MJ at 447, citing *United States v. Piccinonna*, 885 F.2d 1529, 1537 (11th Cir.1989). There is no reason to reverse his ruling. The evidence set a foundation for the government expert's testimony and was useful to the factfinder's evaluation of the government expert's methodology. Therefore, we find no abuse of discretion here.

Detective Wright testified that his tests were not conducted as an absolute re-creation of Rhonda Kaspers' fall. Rather, the tests were conducted to assist him in determining whether the slope surface would accelerate or decelerate an object's fall. This testimony was contradicted by the defense expert, Mr. Freeling, a mechanical engineer. In contrast, Mr. Freeling testified that these

2. As amended through Change V, Executive Order No. 12767, applicable to offenses committed on or after July 6, 1991.

experiments could not assist at all in determining the coefficient of resistance or the sliding properties of the slope.

The videotape of the "tests" showed detectives of the Washington State police dropping a sand-filled jumpsuit, in the form of a "dummy," at the edge of the cliff. After being dropped, the "dummy" flopped down straight to the ground several times. After a slight push, the "dummy" traveled further down the slope of the cliff. In the last "experiment," the dummy was forcefully pushed and it plummeted to the bottom of the cliff.

Appellant also objected to the admission of two other videotapes at trial. These videotapes showed "tests" of two male Washington State detectives throwing a female police officer into a swimming pool. The female officer was thrown by the two detectives, first at a sideways angle and then in a feet first direction. She was also thrown by one detective acting alone in a "fireman's carry" position, and then finally she was pushed a number of times by one detective acting alone. These tests were purportedly done to mimic the angle and distance at which an unsuspecting or unconscious woman could be forced to travel down the cliff's face.

The military judge properly balanced all of the factors outlined in *Houser* and decided that the scales tipped in favor of admitting the evidence. The defense team then competently attacked the weaknesses in the underlying theories of these "experiments" and brought out shortcomings of the Government's experts. Counsel also vigorously and competently exposed the tapes' limitations. This is the model of advocacy envisioned by both *Gipson* and *Daubert*. Thus, the factfinder was properly tasked with the question of how much weight to accord the videotaped experiments. Here, the experiments were performed as close to the actual conditions as possible. The pool test was conducted with a woman of almost the same weight as Rhonda Kaspers. The cliff experiment was conducted with a dummy of the same weight as Rhonda Kaspers and was performed at the exact site of the incident, as pointed out by appellant himself.

In view of all these circumstances, we hold that the military judge did not abuse his discretion in concluding that the experiments were "substantially similar" to the actual conditions surrounding the event and in admitting the evidence of the out-of-court experiments. *See Russell,* 971 F.2d at 1106; *Hale v. Firestone,* 820 F.2d 928, 932 (8th Cir.1987).

## II

The second issue requires us to determine if a military member tried by court-martial is entitled to an *ex parte* hearing to request that a defense expert be paid at government expense. Before trial, the Government notified the defense that they intended to call two Washington State detectives, David and Wright, to testify regarding their experiments and expert opinions about the decelerative properties of the slope. *See* RCM 701(a)(2)(B) and 701(a)(3)(A), Manual, *supra.* Appellant therefore requested his own expert in order to understand, and perhaps dispute, the government experts' opinions. *See* RCM 703(d). He also requested an *ex parte* hearing with the military judge to justify his request to retain a defense expert at government expense. *See United States v. Garries,* 22 MJ 288 (1986). The military judge denied the *ex parte* hearing and ruled that appellant would have to state his supporting reasons to justify this request in open court. After this ruling, appellant opted to reveal strategic information necessary to obtain an expert. The military judge then ordered the Government to fund the defense expert.

At the outset, we have recognized that Article 46, UCMJ, 10 USC § 846, gives the defense "equal opportunity" to obtain witnesses. Ordinarily, a request for an expert witness is directed to the convening authority. *See* RCM 703(d); *see generally United States v. Toledo,* 25 MJ 270, 276 (1987) ("servicemember has no right simply to help himself to government experts and bring them into the attorney-client relationship, bypassing the proper appointing authorities").

In *Garries,* we held that the defense may be entitled to an *ex parte* hearing to demonstrate its need for an expert witness, at

which the defense must show the "relevance and necessity" of the testimony. 22 MJ at 291; RCM 703(d). But an *ex parte* hearing will only be used if the circumstances are "unusual." 22 MJ at 291. In this case, appellant requested an *ex parte* hearing, citing *Garries,* and explained that attorney-client privileges would be compromised should the request be denied.

Nevertheless, appellant argues that he has an absolute right to an *ex parte* hearing and that the judge's failure to grant the hearing is reversible error, citing 18 USC § 3006A(e) and several cases. Final Brief at 16. We respectfully disagree. The federal cases cited by appellant interpret the federal statute at 18 USC § 3006A(e), which is the functional equivalent of RCM 703(d). *See Garries,* 22 MJ at 290. The plain language of the federal statute limits the *ex parte* procedure to defendants who are "financially unable to obtain investigative, expert, or other services necessary for adequate representation." 18 USC § 3006A(e)(1). Although the federal circuits require an *ex parte* hearing once the request for assistance has been made, it is not the absence of an *ex parte* hearing that is tested for error, but rather it is the denial of the assistance after the *ex parte* hearing is held that is scrutinized for abuse of discretion. *See United States v. Alden,* 767 F.2d 314, 319 (7th Cir.1984).

■ Here, we examine our own rule, which requires disclosure by the defense if it desires government funding. *See* RCM 703(d). Using our rule, the judge did not abuse his wide discretion in denying the *ex parte* hearing because appellant did not establish "unusual circumstances." *See Garries,* 22 MJ at 291. Appellant persuasively argues in his final brief that "[d]efense counsel often treads lightly with the famous Sword of Damocles hanging over them when attempting to justify expert requests to the military judge." Final Brief at 18 n. 5. Here, however, defense counsel successfully obtained expert assistance without revealing privileged information or prejudicing his case.

We realize that, while our rule may burden the defense to make a choice between justifying necessary expert assistance and disclosing valuable trial strategy, the defense is not without a remedy. The military judge has broad discretion to protect the rights of the military accused. He did not abuse his discretion in this case by requiring a preliminary showing of necessity on the record.

The decision of the United States Army Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges SULLIVAN, GIERKE, and EFFRON concur.

Judge CRAWFORD did not participate.

## APPENDIX

(Record of Trial at 1751–1753)

MJ: . . . .

* * *

Considering though the argument of counsel, the research that the court has done on the matter, the evidence which has been taken on the motion in limine by the defense in Appellate Exhibits CIV and CV which seeks to prohibit the government from presenting evidence regarding the Washington State Patrol reconstruction test at the site of the death of Mrs. Kaspers or data derived therefrom or from the—what is called by the defense—the pool test reconstruction—that is, data derived from a swimming pool and measurements of a throwing of a[sic] another human being into the pool, the court is persuaded that Mr.—and rules accordingly that Mr. Wright directed that certain tests be accomplished to observe and record data that would assist him in confirming or refuting, challenging or explaining how, given certain known information about Rhonda Kaspers' fall, including description of events that had been provided by Specialist Kaspers and Specialist Maciel, the nature of the injuries to Rhonda Kaspers' body, the topographic features of the terrain, the soil and ground conditions, and the apparent points of impact that had been observed on the cliff face— that is, given those matters, as well as any others that Mr. Wright had available to him—these tests were conducted to help con-

firm or refute the notion of how Rhonda Kaspers fell to the base of the cliff.

Now, these tests included attempts to replicate a body sliding over the edge of the cliff face, and measurements with extrapolations of a person jumping and being thrown into a body of water. In both instances the tests were recorded with a video camera.

Now, based on these findings, the court rules that testimony concerning this testimony [sic] is relevant and material to the apparent issues in this case.

Now, the video recording of the test at the site will assist the fact finder in understanding that actual test and surface conditions prevalent at the site, as well as the limits to such testing.

Similarly, the video recording of the pool data collection demonstrates what that test was that was performed to determine data, which when extrapolated might permit certain other conclusions, and will also assist the fact finder in understanding the nature of the test and its limitations.

Moreover, the probative value of this evidence is not substantially outweighed by the danger of prejudice, confusion of the issues, or misleading of the members—or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The court also finds that this evidence does not amount to a reenactment, but rather was simply testing done to reconstruct or— events or obtain data, as a result of such reconstruction.

Accordingly, the defense's motion in limine concerning both of these tests and the testimony thereon is denied.